Gerald B. ROTH and Logan M. Ammon, Plaintiffs,

v.

SAWYER–CLEATOR LUMBER COMPANY EMPLOYEE STOCK OWNERSHIP PLAN, Charles J. Sawyer and Clifford E. Sawyer, Defendants.

No. 3–91 CIV 347.

United States District Court, D. Minnesota, Third Division.

Nov. 10, 1992.

**1476**

Parsinen Bowman & Levy P.A. by George R. Serdar, and Ann M. Sanford, Minneapolis, Minn., for plaintiffs.

Doherty, Rumble & Butler P.A. by Marc J. Manderscheid, Bruce J. McNeil, and Tracy Smith, St. Paul, Minn., for defendants.

## ORDER

ALSOP, Senior District Judge.

This matter came before the Court on July 10, 1992, on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The parties agree that this case is ripe for summary judgment in either direction.

## I. BACKGROUND

The individual parties in this action were long-time employees, shareholders, and members of the board of directors of the Sawyer–Cleator Lumber Company ("the Company"). Plaintiff Gerald Roth began employment with the Company in 1945 and became vice-president in approximately 1968. Plaintiff Logan Ammon began employment with the Company in 1972 and worked for seventeen years as manager of the Osseo lumber yard. Defendant Clifford Sawyer began full-time work with the Company in 1948 and became its president in 1967. Defendant Charles Sawyer began working for the Company in 1973.

Effective January 1, 1975, the Company established the Sawyer–Cleator Lumber Company Employee Stock Ownership Plan ("the Plan" or "the Sawyer–Cleator ESOP"). The first trustees for the Plan were defendant Clifford Sawyer and Arba Sawyer. Plaintiff Roth replaced Arba Sawyer as a trustee in 1979 and served until June 15, 1987. At that time, defendant Charles Sawyer replaced Roth as trustee of the Plan.

The Plan was established pursuant to the Employee Retirement Income Security Act ("ERISA"), which defines an "employee stock ownership plan" as an "individual account plan" "designed to invest primarily in qualifying employer securities." 29 U.S.C. § 1107(d)(6). The Plan was established and governed by documents ("the Plan documents") that provided that each participant would have two separate accounts. The first account, the "Company Stock Account," was made up of shares of stock of the Company. The second account, the "Other Investments Account," was made up of investments unrelated to the Company. The Plan documents also described how the interests of the individual participants were to be distributed when an employee left the Company. One of the alternatives was a "put option."

Roth retired from the Company on February 26, 1988. Ammon retired from Company on January 1, 1989. Both men chose to exercise their put options. The plaintiffs sold the Company stock from their Company Stock Account back to the Plan, and, in return, they received a promissory note to be paid over time by the Plan. As collateral for the promissory notes, the plaintiffs were granted a security interest in the stock they sold back to

the Plan. Roth's put option was executed in the fall of 1988. Ammon's put option was executed in January, 1990.

Roth's interest in the Plan consisted of $126,489.73 in his Company Stock Account and $30,003.95 in his Other Investments Account. Under the terms of his put option, Roth received a payment of $16,493.68 directly from the Plan, he received another payment of $3,912.43 as interest accrued since July 1, 1988, and he retained a $13,510.09 balance in his Other Investments Account. Roth also received a promissory note for $140,000.00 and a security interest in 9,335.035 shares of Company stock. By agreement between Roth and the Plan, each share of Company stock was valued at $13.55.

Ammon's interest in the Plan consisted of $37,355.47 in his Company Stock Account and $10,164.16 in his Other Investments Account. Under the terms of his put option, Ammon received a cash payment of $15,000.00, a promissory note for $32,519.63, and a security interest in 5,152.478 shares of Company stock. By agreement between Ammon and the Plan, each share of Company stock was valued at $7.25.

The Company faced difficult financial times and closed down its operations on December 7, 1990. Subsequently, the Company was forced by its creditors to file for Chapter 7 bankruptcy in February, 1991. This bankruptcy made the Company's stock and, therefore, the plaintiffs' security interests worthless. With the Company out of business, there was also no hope that further contributions would be made to the Plan. It was clear that the Plan did not have sufficient assets remaining to pay its other obligations and plaintiffs' promissory notes in full. Therefore, the Plan trustees ceased all further payments until a final distribution could be made.

Plaintiffs brought this lawsuit in June, 1991, asserting claims under ERISA for breach of fiduciary duty, breach of contract, and misrepresentation against the Plan and Charles and Clifford Sawyer as the Plan's trustees. The defendants filed an answer and counterclaimed for a declaratory judgment. The declaratory judgment action asks this court to determine the trustees' obligations to the Plan's participants.

## II. ANALYSIS

### A. Standard of Review

The Supreme Court has held that summary judgment is to be used as a tool to isolate and dispose of claims or defenses which are either factually unsupported or which are based on undisputed facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hegg v. United States*, 817 F.2d 1328, 1331 (8th Cir.1987). Summary judgment is proper, however, only if examination of the evidence in a light most favorable to the non-moving party reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The test for whether there is a genuine issue over a material fact is two-fold. First, the materiality of a fact is determined from the substantive law governing the claim. Only disputes over facts that might affect the outcome of the suit are relevant on summary judgment. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512; *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Second, any dispute over material fact must be "genuine." A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. It is the non-moving party's burden to demonstrate that there is evidence to support each essential element of his claim. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

### B. Plaintiffs' Claims for ERISA Breach of Fiduciary Duty (Counts I & IV)

In Counts I and IV of their Complaint, the plaintiffs, Gerald Roth (Count I) and

Logan Ammon (Count IV), allege that the defendants Charles and Clifford Sawyer violated their fiduciary duty as trustees to the Plan.

Some confusion exists with regard to the plaintiffs' cause of action against the Plan. In Counts I and IV of their Complaint, the plaintiffs allege that the defendant trustees breached the fiduciary duty owed to the plaintiffs. ERISA § 402(a)(1) establishes the standard of care an ERISA trustee owes to an ERISA plan and its participants.[1] 29 U.S.C. § 1104(a)(1). Under ERISA § 409(a), a fiduciary who breaches this standard of care is personally liable to the plan for any loss resulting to the plan from the breach. 29 U.S.C. § 1109(a). Although the plaintiffs' complaint does not state that Counts I and IV are brought under ERISA § 409(a), the court assumes that this is what they intended to plead.

For the purposes of this motion, the court will also assume that not being able to fully pay the plaintiffs' promissory notes constitutes a loss to the Plan under ERISA § 409(a). The plaintiffs conclude without citation that the alleged breach of fiduciary duty has subjected other plan assets to the plaintiffs' claim, and, therefore, the Plan has suffered a loss. *See* Plaintiffs' Supporting Memorandum at 18. These other plan assets, however, are presumably the source of the additional security that the plaintiffs now claim should have been provided to them. If the Plan had somehow been able to grant the plaintiffs additional security, other participants would now stand to recover less. Likewise, under the theory of liability the plaintiffs have argued in this case, they would recover any funds that the trustees would be ordered to pay into the Plan. This would not jeopardize other plan assets.

A successful ERISA § 409(a) breach of fiduciary duty claim puts money back into a plan. To get the money out of a plan, a participant must make a claim for benefits. At common law, the plaintiffs would have simple contract actions on their notes for the amounts still due to them. Under ERISA, however, a participant or beneficiary of a plan must bring an action under section 502(a)(1)(B) "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). The plaintiffs have not properly pled an action against the Plan under ERISA § 502(a)(1)(B).[2] All parties agree, though, that the plaintiffs have such a claim.

The court will construe Counts I and IV as actions under ERISA § 409(a) seeking to hold the defendant trustees personally liable to the Plan for damages caused by their alleged breach of fiduciary duty. The court will dismiss without prejudice the defendants' counterclaim and any action the plaintiffs may have against the Plan under ERISA § 502(a)(1)(B).[3]

1. *Fiduciary Duties Under ERISA*

Under ERISA, every employee benefit plan must name one or more fiduciaries who have the authority to manage and administer the plan. 29 U.S.C. § 1102(a)(1); ERISA § 402(a)(1). An ERISA fiduciary is held to the duties and standard of care of a prudent man:

(a) Prudent man standard of care

(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

---

1. Although there was originally some question about whether the plaintiffs qualified as participants of the Plan, the parties agreed on this point at oral argument.

2. The plaintiffs represented to this court that they did in fact "state claims" under ERISA § 502(a)(1)(B) in Counts I and IV. *See* Plaintiffs' Supporting Memorandum at 19. In the "Preliminary Allegations" section of their complaint, the plaintiffs do state that they "are protected by ERISA and entitled to bring this civil action pursuant to ERISA §§ 502(a) and 409." No such claim is made, however, under the individual counts in the complaint. In fact, although the Plan is named as a defendant in the caption, the Complaint does not contain a single allegation directed against the Plan under the various counts.

3. If, as a consequence of this dismissal, a claim by the plaintiffs under ERISA § 502(a)(1)(B) would be time-barred, the court will retain jurisdiction to entertain a motion by the plaintiffs to amend their complaint.

(A) for the exclusive purpose of:

(i) providing benefits to participants and beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims.

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan....

29 U.S.C. § 1104(a)(1); ERISA § 404(a)(1).

A fiduciary who breaches his or her duty to a plan is personally liable for any loss to the plan resulting from the breach. 29 U.S.C. § 1109(a); ERISA § 409(a). A co-fiduciary is also liable for another fiduciary's breach if he or she participated in the breach or enabled the breach by failing to maintain the "prudent man standard of care." 29 U.S.C. § 1105(a); ERISA § 405(a).

### 2. *Employee Stock Ownership Plans*

Employee stock ownership plans ("ESOPs") are a unique type of ERISA employee benefit plan created by Congress. As the name implies, ESOPs purchase and hold employer stock. An ESOP exists not only to provide employees with retirement income, but also to allow employees to invest in the employer, thereby providing capital for corporate expansion. The Eighth Circuit recently commented on these dual purposes:

An ESOP is an ERISA plan which invests primarily in "qualifying employer securities," typically stock of the employer creating the plan. Congress expressly intended that the ESOP would be both an employee retirement benefit plan and a "technique of corporate finance" that would encourage employee ownership.

The concept has been roundly criticized, particularly because, as this case graphically illustrates, an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan. But that is a question for Congress.

*Martin v. Feilen,* 965 F.2d 660, 664 (8th Cir.1992) (citations omitted).

Because an ESOP invests primarily in employer stock, the value and security of the employees' retirement fund necessarily fluctuates with the fortunes of the employer. This is in contrast with the more common pension benefit plan, for which Congress created the Pension Benefit Guaranty Corporation ("PBGC") to provide a guarantee of retirement income if the sponsoring employer should become insolvent. *See* 29 U.S.C. § 1321; ERISA § 4021. "Individual retirement plans" like the Sawyer–Cleator ESOP, can not qualify for the PBGC guarantee. 29 U.S.C. § 1321(b)(1); ERISA § 4021(b)(1).

The unique nature of ESOPs necessitates that special rules apply to their fiduciaries. For example, ESOP fiduciaries are statutorily exempt from the ERISA-imposed duty to diversify the plan's investments. *See* 29 U.S.C. § 1104(a)(2); ERISA § 404(a)(2). However, these

statutory exemptions for ESOPs in ERISA do not relieve a fiduciary from the general fiduciary responsibility provisions of [29 U.S.C. § 1104] which, among other things, require a fiduciary to discharge his duties respecting the plan solely in the interests of plan participants and beneficiaries and in a prudent fashion[,] nor does it affect the requirement that a plan must be operated for the exclusive benefit of employees and their beneficiaries.

*Martin v. Feilen,* 965 F.2d at 665 (citations, ellipses, and brackets omitted). Therefore, the basic standard for ESOP fiduciaries is still that of a "prudent man" "under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B); ERISA § 404(a)(1)(B).

### 3. ESOPs and Put Options

The Internal Revenue Code dictates that ESOP participants have a right to demand a distribution of their benefits in the form of employer securities. See 26 U.S.C. § 409(h)(1)(A). If the ESOP distributes employer securities that are not readily tradable on an established market, a participant must also be given the right to require the employer to repurchase the securities under a fair valuation formula. 26 U.S.C. § 409(h)(1)(B). The participant's rights in this situation are referred to as a put option. In the Sawyer–Cleator ESOP, the Plan documents also provide for a put option. See Sawyer–Cleator Lumber Company Employee Stock Ownership Plan § VII.B.2d.

The plaintiffs in this case exercised their put option and sold the Company stock back to the Plan.[4] As payment for their shares, each plaintiff received a promissory note and took a security interest in the stock. Under the Internal Revenue Code, such a note must provide for "substantially equal periodic payments," "adequate security," and "reasonable interest." 26 U.S.C. § 409(h)(5)(A)–(B); see also, 29 C.F.R. § 2550.408b–3(l)(4) ("The provisions for payment under a put option must be reasonable. The deferral of payment is reasonable if adequate security and a reasonable interest rate are provided...."). In this lawsuit, the plaintiffs allege that they did not receive adequate security for their promissory notes.

### 4. Adequate Security

As collateral for the promissory notes, the Plan granted the plaintiffs a security interest in the shares of stock it repurchased from them. In theory, because the Plan did not make the payments required under the promissory notes, the plaintiffs are entitled to retake possession of the securities and sell them. However, in this case, the Plan stopped making payments when the Company went bankrupt, and, because the Company is bankrupt, the shares have no value.

Neither ERISA nor the Internal Revenue Code defines "adequate security" in this context. The Plan documents for the Sawyer–Cleator ESOP do not define the term "adequate security" either. The plaintiffs cite three sources of authority for their argument that the security interest in Company stock was inadequate as a matter of law. The defendant trustees argue that the security interests given to the plaintiffs had values equal or greater than the notes they secured, and, therefore, the plaintiffs received adequate security, and the trustees did not breach their fiduciary duty as a matter of law.

#### a. Department of Labor Regulations

The plaintiffs first ask the court to look to the definition of "adequate security" in the context of a loan from a plan to a participant. See 29 C.F.R. § 2550.408b–1(f)(1). This regulation states:

> A loan will be considered to be adequately secured if the security posted for such

---

**4.** Although the Internal Revenue Code gives a participant the right to require that the employer repurchase the securities, in this case, it was the Plan, rather than the plaintiffs' employer, that repurchased the securities. However, this is appropriate under ERISA. The relevant regulation states that:

> [t]he put option must permit a participant to put the security to the employer. Under no circumstances may the put option bind the ESOP. However, it may grant the ESOP an option to assume the rights and obligations of the employer at the time that the put option is exercised.

29 C.F.R. § 2550.408b–3(j); see also, S.Rep. No. 1263, 95th Cong., 2d Sess. 87 (1978) ("Although the obligation to repurchase stock under the put option would apply to the employer, not the ESOP ..., it is permissible for the ESOP to actually make the purchase in lieu of the employer."). The Plan documents for the Sawyer–Cleator ESOP also provide the Plan with a "right of first refusal" when a put option is exercised, and give the participant "the right to have the [Plan] and/or the Employer purchase" the shares. See Sawyer–Cleator Lumber Company Employee Stock Ownership Plan § VII.B.2d.

The plaintiffs' Complaint alleges that the trustees "improperly implemented the put options by naming the Plan, rather than the Company, as the obligated party on the Promissory Note[s]." The plaintiffs have not pursued this argument in their supporting memoranda. However, to the extent that the plaintiffs allege that this action, by itself, constitutes a breach of fiduciary duty, the defendants are entitled to summary judgment.

loan is something in addition to and supporting a promise to pay, which is so pledged to the plan that it may be sold, foreclosed upon, or otherwise disposed of upon default of repayment of the loan, the value and liquidity of which security is such that it may reasonably be anticipated that loss of principal or interest will not result from the loan. The adequacy of such security will be determined in light of the type and amount of security which would be required in the case of an otherwise identical transaction in a normal commercial setting between unrelated parties on arm's-length terms. A participant's vested accrued benefit under a plan may be used as security for a participant's loan to the extent of the plan's ability to satisfy the participant's outstanding obligation in the event of default.

*Id.* The defendants correctly point out that this regulation is limited by its own language to loans made by a plan to a participant. In contrast, when a participant exercises a put option and takes a promissory note, the participant is making a loan to the plan.

The court recognizes that the regulation is not directly applicable. However, the court finds that the regulation is instructive, and it articulates some applicable principles. First, adequate security is "something in addition to and supporting a promise to pay." Second, if the borrower defaults, the lender must be able to foreclose on and sell the security. Third, the value of the security must be "such that it may reasonably be anticipated that loss ... will not result." Finally, the amount of security should be equivalent to that which would result from an arm's-length transaction.

The defendant trustees claim that, even if these standards are applied, the plaintiffs received adequate security. The court agrees. It is undisputed that the security interest in the Company stock was something in addition to and supporting the promissory note and that the plaintiffs have the right to foreclose on the Company stock. The plaintiffs have put forward no evidence and the court has no reason to believe that the trustees believed the security would be inadequate to cover a default by the Plan on the promissory notes. Finally, the court notes that it is common commercial practice for a lender to take a security interest in the object purchased with the borrowed money. Under the Uniform Commercial Code, this is referred to as a "purchase money security interest." *See* U.C.C. § 9–107(b).

**b. Cofer v. The Audichron Company**

As a second source of authority, the plaintiffs cite an opinion from the Northern District of Georgia. *See Cofer v. The Audichron Co.,* 7 E.B.C. 2104 (N.D.Ga.1986). In *Cofer,* ESOP participants exercised a put option to have the employer repurchase stock from the employer company. In return, the employer gave the participants unsecured promissory notes. The plaintiffs claimed that this was not adequate security because the promissory notes had no reference to supporting collateral or security. The defendant employer argued that the notes were adequately secured by the employer's own assets and equity.

For guidance, the court in *Cofer* looked to the language of the analogous regulation discussed above and held that "[b]ecause it is undisputed that [the employer's] promissory notes are 'secured' only by its assets and equity, [the employer] has failed to provide 'adequate security' within the meaning of the pertinent regulation." *Id.* at 2105. Summary judgment was granted against the employer.

In this case, the plaintiffs argue that the Plan, by securing the promissory notes with the Company's stock, gave the plaintiffs nothing more than an unsecured interest in the Company's assets and equities. *Cofer,* however, is distinguishable from the facts of this case.

The court in *Cofer* found that the employer's promissory notes were informally secured by nothing more than the employer's assets and equity. In this case, the plaintiffs received promissory notes from the Plan, and they were each given a formal security interest in Company stock owned by the Plan. This security interest partitioned off specific assets and gave the

plaintiffs the right to foreclose on these assets.

The practical result in *Cofer* and this case turns out to be the same—the participants' security is apparently worthless. However, there are important conceptual distinctions. The Company and the Plan are distinct corporate entities. Had the Plan stopped paying for some other reason than the Company's bankruptcy, the plaintiffs would have been able to foreclose on the Company stock. The plaintiffs here were also given a security interest in specific collateral rather than having the notes generally "secured" by the assets and equity of the employer. Finally, and perhaps most importantly, the Plan had no assets it could provide as collateral other than the shares of Company stock it was acquiring from its retired participants. All of its other assets were allocated to the individual accounts of Plan participants.

Another important distinction between this case and *Cofer* is the underlying cause of action. The plaintiffs in *Cofer* brought their action under ERISA § 502(a)(1)(B) "to recover benefits due." 29 U.S.C. § 1132(a)(1)(B). The plan's trustee was also named as a defendant in *Cofer*, but the trustee was granted summary judgement because the plaintiffs failed to allege a separate fiduciary violation and "failed to point to any evidence of a violation." *Cofer*, 7 E.B.C. at 2105.[5] Therefore, *Cofer* lends no precedential support in this case to the plaintiffs' claim of breach of fiduciary duty.

### c. The Stock Pledge Agreement

As a third source of authority for their argument, the plaintiffs quote language from the Stock Pledge Agreement that established the plaintiffs' security interest. In relevant part, this agreement states:

> Pledgee shall have the right in the event of default, without liability for any diminution in price which may have occurred, to sell all the pledged stock (ex-

cept as limited hereinbelow) in such a commercially reasonable manner and for such price as Pledgee may determine. *At any bona fide public sale, Pledgee shall be free to purchase all or any part of the pledged Stock. Out of the proceeds of any such sale, Pledgee may retain an amount equal to the principal and interest then due on the loan, plus the amount of the expenses of the foreclosure, collection, enforcement and sale (including reasonable attorneys' fees and court costs), and shall pay any balance of such proceeds to the Pledgor.* In the event that the proceeds of any such sale are insufficient to cover the principal and interest of the loan plus all such expenses, the Pledgor shall remain liable to Pledgee for any deficiency. Stock Pledge Agreement at ¶ 5 (emphasis added).

The two underlined sentences were deleted by the plaintiffs and substituted with an ellipse when the Stock Pledge Agreement was quoted to the court. *See* Plaintiffs' Supporting Memorandum at 17. The plaintiffs then argue that the Stock Pledge Agreement "directly acknowledges the inadequacy of its proposed purpose." *Id.* at 18. The deleted language reveals that this argument is without merit.

### 5. The ESOP Fiduciary Duty Standard Applied

■ The court concludes, as a matter of law, that the defendant trustees did not breach their fiduciary duty. The actions of an ERISA trustee are judged under the circumstances that existed at the time the decision was made. *Donovan v. Walton*, 609 F.Supp. 1221, 1238 (S.D.Fla.1985), *aff'd, Brock v. Walton*, 794 F.2d 586 (11th Cir.1986); *DeBruyne v. Equitable Life Assur. Soc. of the United States*, 720 F.Supp. 1342, 1347–49 (N.D.Ill.1989), *aff'd*, 920 F.2d 457 (7th Cir.1990). As stated above, the general standard for an ESOP fiduciary is that of a prudent person under the circum-

---

**5.** The court's opinion in *Cofer* does not make it clear that the defendant Bank of the South was the plan's trustee. However, this defendant was identified as the plan's trustee in Ronald S. Rizzo et al., *Fiduciary and Corporate Sponsor*

*Concerns in Employee Stock Ownership Plan Transactions* (ALI–ABA Course of Study 1991), *available in* Westlaw, TP–All database, cited as C634 ALI–ABA 325.

stances then prevailing. 29 U.S.C. § 1104(a)(1)(B); ERISA § 404(a)(1)(B).

As collateral for their promissory notes, the plaintiffs were given security interests in the stock they sold back to the Plan. Plaintiff Roth was given a promissory note for $140,000.00, and he took a security interest in 9,335.035 shares of Company stock that were worth $126,489.72 at that time. In addition, he retained a balance of $13,510.09 in his Other Investments Account. Plaintiff Ammon was given a promissory note for $32,519.63, and he took a security interest in 5,152.478 shares of Company stock that were worth $37,355.47 at that time. These security interests were also the only collateral the Plan had to offer the plaintiffs.

The plaintiffs' security interests constituted "adequate security" under ERISA, the Internal Revenue Code, and the Plan documents. The parties agree that this phrase is not specifically defined in the context of put options. The parties have not provided, nor has the court found any judicial opinions directly addressing this issue. One academic article, however, has addressed the issue in passing:

> The Act also clarifies that if the repurchase is being made over a period of time, there must be adequate security and a reasonable rate of interest must be paid.
>
> \* \* \* \* \* \*
>
> Although neither the Act nor the Code defines adequate security, it could be argued by analogy to the qualified plan loan rules that a pledge back of the repurchased shares would ordinarily by adequate.

Howard M. Esterces & Steven Glaser, *ESOPs Even More Attractive to Major Shareholders After Tax Reform Act of 1986*, 66 J.Tax'n 273, 277 (1987). The plaintiffs have not argued or presented this court with any facts suggesting that the trustees had knowledge of the Company's financial condition that would take this case out of the ordinary. Instead, the plaintiffs argue that securing the promissory notes with the repurchased shares constituted inadequate security and therefore a breach of fiduciary duty as a matter of law. The court is unable to accept this argument.

The plaintiffs have argued that "[t]he conduct of the trustees also establishes a breach of the 'exclusive purpose' requirements of ERISA § 404." Plaintiffs' Supporting Memorandum at 15. ERISA § 404(a)(1)(A) provides that an ERISA trustee must discharge his or her fiduciary duties "for the exclusive purpose of: (i) providing benefits to participants ...; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The plaintiffs have not supported this assertion with any evidence, and the court finds it to be without merit.

C. Plaintiffs' State Law Claims (Counts II, III, V & VI)

In Counts II and V of their Complaint, the plaintiffs allege that the promissory notes created a contractual relationship between themselves and the defendants and that the defendants breached these contracts when they stopped making payments on the notes. In Counts III and VI, the plaintiffs allege that the defendants made tortious misrepresentations to them about the adequacy of the security used in the put options.

All of these state law claims are preempted by ERISA. *See* 29 U.S.C. § 1144(a); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983); *Consolidated Beef Indus. v. New York Life Ins. Co.*, 949 F.2d 960, 964 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). Summary judgment for the defendants is appropriate on all four state law causes of action.

Accordingly, based on a review of all the files, records, and proceedings herein,

IT IS HEREBY ORDERED That

1. Plaintiffs' Motion for Summary Judgment is DENIED.

2. Counts I and IV of the Plaintiffs' Complaint shall be construed as an action under ERISA § 409(a) for breach of fidu-

ciary duty against defendants Charles J. Sawyer and Clifford E. Sawyer.

3. Defendants Charles J. Sawyer and Clifford E. Sawyer's Motion for Summary Judgment on Counts I and IV is GRANTED.

4. Any claims the plaintiffs may have against the Sawyer–Cleator Lumber Company Employee Stock Ownership Plan under ERISA § 502(a)(1)(B) are DISMISSED without prejudice.

5. Defendants Charles J. Sawyer, Clifford E. Sawyer, and the Sawyer–Cleator Lumber Company Employee Stock Ownership Plan's Motion for Summary Judgment on Counts II, III, V, and VI is GRANTED.

6. The Sawyer–Cleator Lumber Company Employee Stock Ownership Plan's Counterclaim for Declaratory Judgment is DISMISSED without prejudice.