TARGET MARKET PUBLISHING, INC., Plaintiff–Appellant,

v.

ADVO, INC., Defendant–Appellee.

No. 97–1979.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1998.

Decided Feb. 18, 1998.

Robert C. Keck, Jr. (argued), Jodi B. Meister, Keck & Associates, Chicago, IL, for Plaintiff–Appellant.

Arthur W. Friedman (argued), Miller, Shakman, Hamilton, Kurtzon & Schlifke, Chicago, IL, for Defendant–Appellee.

Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge. ·

In 1993, Target Market Publishing, Inc. ("Target") and ADVO, Inc. ("ADVO") entered into a one-year contract to produce and market a direct mail advertising publication known as Select Auto. The joint venture involved selling auto dealers exclusive advertising rights at a flat rate in the publication, which would be mailed monthly to targeted zones of 100,000 households. The two companies agreed to test the new product in Cleveland and, if it met with success there, to introduce it into additional markets. Target and ADVO were to share equally any net profits from the venture.

The degree to which the joint venture was actually profitable is the primary subject of dispute in this appeal. Efforts to sell advertisements in Select Auto began in Cleveland in September 1993. ADVO salespeople recruited fifteen advertisers for the October issue, which was distributed to homes in two Cleveland area zones. Target and ADVO continued to market and distribute the publi-

cation in Cleveland for several more months, but the number of advertisers participating decreased steadily until only three were willing to advertise in the proposed March 1994 issue. ADVO decided that Select Auto was no longer viable in the Cleveland market and suspended publication. Target argues that the drop in advertiser participation in Cleveland was due to ADVO's failure adequately to support its sales staff there.

Beginning in November 1993, Target and ADVO began efforts to sell advertising in Select Auto publications in New Orleans and Baton Rouge, with the goal of distributing the publications by mail in each market in March 1994. Despite these efforts, no auto dealers signed contracts to advertise in Select Auto in either market. On February 1, 1994, the companies began trying to sell Select Auto to dealers in San Antonio and Austin. As of the end of February, only one dealer in those cities had agreed to advertise in Select Auto.

On March 2, 1994, ADVO notified Target that it was ceasing its performance under the contract. It is assumed for purposes of this appeal that ADVO was at that time still obligated to perform under the contract for the remaining five months of the original term, which was to expire on July 31, 1994. Target filed this lawsuit against ADVO on April 28, 1994, charging breach of contract and breach of fiduciary duty. ADVO filed a motion to dismiss, on the ground that Target had not pled facts showing that it could recover the minimum amount required for federal diversity jurisdiction (at the time, $50,000). The district court denied the motion, and the parties proceeded with discovery.

After the close of discovery, on March 31, 1996, ADVO filed a motion for summary judgment, arguing that the record was now complete enough for the court to find that Target could not recover the jurisdictional minimum amount. Five months later, in a terse opinion of three paragraphs, the district court granted summary judgment for ADVO, concluding that it appeared to a legal

certainty that Target could not recover the minimum amount on its breach of contract claim. The court also granted summary judgment for ADVO on the merits of the breach of fiduciary duty claim, finding no reasonable basis in the evidence upon which a jury could find for Target. Target appeals the grant of summary judgment as to both counts, and this Court affirms.

## I. BREACH OF CONTRACT CLAIM

As noted above, ADVO initially sought to dismiss Target's complaint on the ground that it failed to allege facts showing that Target could recover more than $50,000, which at the time was the minimum amount in controversy required to invoke the federal courts' diversity jurisdiction.[1] The district court denied the motion to dismiss, holding that the cursory record available to it at that time did not allow it to determine that Target could not possibly recover more than $50,000. When ADVO reasserted the issue in its motion for summary judgment, however, the district court determined that Target could not recover that amount and accordingly granted judgment for ADVO.

We review the district court's grant of summary judgment *de novo.* *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265. The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202.

If the matter is uncontested, federal courts will accept a plaintiff's allegation of

---

1. The minimum amount in controversy was subsequently increased to $75,000 in 1996. See 28 U.S.C.A. § 1332(a) (West Supp.1997). It had increased from $10,000 to $50,000 in 1988. See *id.*, Commentary on 1996 Amendment.

a sufficient amount in controversy unless it "appears to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845; *Rexford Rand Corp. v. Ancel,* 58 .F.3d 1215, 1218 (7th Cir.1995). If the defendant.challenges the allegation, as ADVO has in this case, the plaintiff must support its assertion with "competent proof," *Rexford,* 58 F.3d at 1218 (quoting *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135), which means "proof to a reasonable probability that jurisdiction exists." *Id.* (quoting *NLFC, Inc. v. Devcom Mid–America, Inc.*, 45 F.3d 231, 237 (7th Cir.1995), *certiorari denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257).[2]

■ In an attempt to meet this burden of proof, Target relies primarily upon an expert report prepared by Bruce W. Burton, an accountant and business appraiser with the firm of Deloitte & Touche. The Burton report concludes that, "[h]ad ADVO performed its obligations under the . Joint Venture Agreement, [Target] should have earned $1.4 million during the contract period ending 7/31/94." ADVO replied that the Burton report is pure speculation, based upon utterly implausible assumptions and unreliable methodology. The district court appeared to agree with ADVO's assessment, stating that Target "relies upon mere assumptions . . . from which no reasonable inference of lost profits could be drawn" (March 31, 1997 Order, at 2).

Target complains that in reaching this conclusion the district court impermissibly weighed the evidence on a motion for summary judgment. On this view, the court overstepped its bounds and resolved on summary judgment an issue that is properly reserved for the fact finder at trial. ADVO counters that what the court really did, albeit without saying so explicitly, was to exclude the Burton report as unreliable under the standard announced in *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. *Daubert* reaffirmed the district court's vital role in deciding the admissibility of scientific expert testimony and elaborated standards for courts to use in discharging that role. See *id.* at 592–595, 113 S.Ct. at 2796–2798. The district court is obligated to "make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–593, 113 S.Ct. at 2796. ADVO argues, in essence, that the district court implicitly ruled that the Burton report was not "scientific" because it relied upon assumptions that were unrealistic and divorced from the realities of the Select Auto joint venture.

■ This Court first must resolve, therefore, whether the district court's Order excluded the Burton report as unreliable under *Daubert.* The Order admittedly is rather cryptic in this regard. After stating the conclusion mentioned above that Target "relies upon mere assumptions . . . from which no reasonable inference of lost profits could be drawn," the Order adds that "the entire body of evidence that is not mere speculation does not support an award of lost profits that satisfies the jurisdictional minimum" (March 31, 1997 Order, at 2). ADVO argues that these passages indicate the court's decision to exclude the Burton report because it rests on "mere assumptions" and then evaluate the remaining evidence as to lost profits. Target, on the other hand, interprets the court's words to mean that it admitted and considered the Burton report but impermissibly determined that it was entitled to little or no weight because of its "speculative" nature.

Target relies primarily upon a case in which this Court stated that "the contention that [an expert witness'] opinion was speculative goes to the weight jurors might choose to accord his testimony." *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1405–1406 (7th Cir.

---

2. It appears from the district court's Order that the judge applied the higher standard, finding to a legal certainty that Target could not recover more than $50,000, even though the question arose as a result of ADVO's challenge to jurisdic-

tion. It stands to reason, however, that the court's finding of a "legal certainty" necessarily implies the lesser conclusion that Target did not prove jurisdiction "to a reasonable probability."

1991), certiorari denied, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228. In that case, however, the Court was reviewing a decision by the district court to admit certain expert testimony. Because the testimony was based on actual price changes in the coal industry and the costs incurred by a mining company in its last year of operation, we held that it was not an abuse of discretion to admit it, and that the jury could cope with any argument that the basis for the expert's conclusions was inadequate. See *id.*

The *Williams* holding, that on the facts of that case whether a particular expert's testimony was or was not "speculative" is a question for the jury, is a far cry from an ironclad rule that a court may never exclude evidence because it is too "speculative" as a matter of law. Indeed, *Daubert* and the Federal Rules of Evidence require that a district court be willing and able to do just that. If, for instance, an expert who was well qualified as an astronomer offered to testify based on lengthy and careful observation that the sun revolves around the earth, a court would not be obliged to submit the testimony to the jury. The Supreme Court recently upheld a district court's decision to exclude expert testimony on the ground that it "did not rise above 'subjective belief or unsupported speculation.'" *General Electric Co. v. Joiner,* — U.S. —, —, 118 S.Ct. 512, 516, 139 L.Ed.2d 508 (quoting 864 F.Supp. 1310, 1326 (N.D.Ga.1994)). This Court, moreover, has not hesitated in the past to uphold a district court's decision to exclude expert testimony on similar grounds. See, e.g., *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir.1997); *Lester v. Resolution Trust Corp.*, 994 F.2d 1247, 1252–1253 (7th Cir.1993).

Although we would have preferred that the district court make its decision to exclude the Burton report more explicit, we conclude that it did in fact make that decision. The court's statement resolving the lost profits question based upon "the entire body of evidence that is not mere speculation" and its finding that "no reasonable inference of lost profits could be drawn" from the report's assumptions support the conclusion that it found the report inadmissible. Given these statements, we will not take Target's suggestion and simply assume that the court impermissibly weighed the evidence in granting summary judgment.

 Target also argues that even if the district court did implicitly rule the Burton report inadmissible under *Daubert,* it erred in doing so.[3] It calls this Court's attention to the long experience and voluminous credentials of the report's author, notes that other courts have accepted "similar" calculations of lost profits, and offers argument as to why the assumptions upon which the Burton report rests are indeed warranted.

We note first that the Supreme Court has recently resolved any ambiguities concerning the standard of review that the courts of appeals are to apply in reviewing a district court's evidentiary rulings under *Daubert.* The standard of review is the same one applied to other evidentiary rulings—that is, abuse of discretion. See *General Electric Co.,* — U.S. at —, 118 S.Ct. at 515.

The *General Electric* case also goes a long way toward explaining why the district court's decision to disregard the Burton report was not an abuse of discretion. In *General Electric,* the district court had granted summary judgment for the defendant corporation against a claim that one of its employees had developed lung cancer as a result of exposure to chemicals in the course of his work. See *id.* at —, 118 S.Ct. at 516. The employee presented expert evidence concluding that exposure to the chemi-

---

**3.** We deal only briefly with Target's additional argument that the district court erred in not holding a hearing *in limine* before excluding the Burton report. Target has cited no case from this Circuit for the proposition that such a hearing is uniformly required in order to find expert testimony inadmissible. Moreover, we note that the Supreme Court did not suggest in either *Daubert* or *General Electric* that district courts would be required to conduct *in limine* hearings concerning every rejected proffer of expert testimony. The district court in the present case had before it Burton's report and all of the documents upon which that report purportedly drew. Target is apparently unable to tell this Court exactly what missing information a hearing would have supplied to aid the district court in making its determination. A hearing was not required.

cals increased his risk of contracting cancer, but the district court held that the testimony "did not rise above 'subjective belief or unsupported speculation.'" *Id.* (quoting 864 F.Supp. 1310, 1326 (N.D.Ga.1994)). Applying the abuse of discretion standard, the Supreme Court affirmed, stating that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at ——, 118 S.Ct. at 519.

The district court in the present case reached precisely such a conclusion. The Burton report projecting $1.4 million in profits for the Select Auto venture by the end of the twelve-month contract period was based upon assumptions that do not legitimately support the conclusion. Burton assumed first that certain errors and inefficiencies that plagued the Cleveland experiment in the initial months would be remedied in subsequent months. So far, the assumption seems warranted, and ADVO admits that some of these extra costs could have been eliminated had the project continued. There, however, the problems begin.

In his report, Burton also assumed that Select Auto would penetrate into a total of forty-nine marketing zones, that each zone would generate fourteen advertisers per monthly issue, and that virtually all of those advertisers would pay the full price for their ads. Target attempts halfheartedly to argue that the court should have considered profits that could have been earned after the expiration of the contract's one-year term (on the assumption that ADVO would have somehow been obligated to renew the contract if it was, as Target claims, a profitable venture to begin with). This argument is untenable, and Target seems to realize as much when it falls back upon the last ditch claim that Select Auto would have generated $1.4 million by the end of the initial contract period. But in order to reach this figure Target needs to rely on the Burton report's assumption that the publication could instantaneously achieve full penetration into dozens of

geographic zones in which no sales effort had even begun as of March 2, at which time the contract term was already well over half completed. Recall that in Cleveland, which was the initial test market for Select Auto, advertiser participation had declined from a peak of fifteen to only three by February of 1994. It is undisputed that as of the end of February, seven months into the one-year contract, Target's share of the profits from Cleveland amounted to approximately $1,300. Additionally, the parties had been entirely unsuccessful in their efforts to introduce Select Auto into markets in New Orleans, Baton Rouge, San Antonio, and Austin.

But Target need not show that its losses were $1.4 million; it need only demonstrate a loss of more than $50,000. At the Burton report's projected figure of $24,266 per zone per month, the jurisdictional minimum could have been met if only one zone had met the projection for some two to three months. Given the declining advertiser participation in the Cleveland version of Select Auto and the apparent failure to attract advertisers in Louisiana or Texas, even this limited projection seems unwarranted. Target's claim that the demise of the Cleveland experiment was due to ADVO's refusal to perform its contractual duty to provide sales support is based primarily upon assertions by Target's own personnel, and "a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment." *Weeks v. Samsung Heavy Indus. Co.,* 126 F.3d 926, 939 (7th Cir.1997). In any event, the claim is not sufficient to render the Burton report's optimistic assumptions plausible.

Target argues that Burton's projections are in fact based upon ADVO's own analyses of Select Auto's potential profitability. It points to a January 1994 Marketing Plan prepared by Hank Rodkin, who was at the time an ADVO executive but later became an expert witness for Target; a January 25, 1994 memo from Linda Cheney, another ADVO executive; and ADVO's Select Auto Marketing Plan from February 28, 1994.

The Rodkin document projected that Select Auto would produce a profit of $24,602 per month per zone, and that total profits for 1994 would be $5,401,200. Burton's per-zone

estimate of $24,266, Target points out, is thus slightly lower than the one projected in the Rodkin document. ADVO denies that the projections in the Rodkin Marketing Plan were ever realistic in light of the initial experience in Cleveland. In any event, ADVO argues, a January 31, 1994 forecast prepared by ADVO, which predicted profits based solely on the actual sales experiment in Cleveland, projected a net profit for ADVO of only $9,028 through September 1994. Based on this document, the profit for the contract period, which ended July 31, would have been something less than $9,028.

The Cheney memo projected monthly per-zone profits at approximately the same level as the Rodkin document. The February 28, 1994 Marketing Plan was even more optimistic, projecting profits of more than $31,000 per month per zone. Target also notes that the latter document was dated only two days before ADVO notified Target that it would no longer perform under the contract. If ADVO itself believed at this late date that Select Auto could generate such profits, then how could the court find Burton's more conservative figures unduly speculative?

The problems with this argument lie in the timing and in the details. An ADVO executive testified, and Burton himself admitted, that the February 28 Marketing Plan was identifying a target profit, not making a projection of actual profits. The plan sought to demonstrate what Select Auto's profits might be given certain assumptions that had not yet, and might never, come to pass. For instance, the numbers assumed that all advertisements in Select Auto could be sold at full price, but the plan noted elsewhere that steep price discounts would be necessary, at least in the short term, to attract advertisers. In addition, the plan contemplated a "scaled back test market ... [and a] delayed rollout" and stated that an objective at that time was for "[n]ew markets [to] break even after six-month introductory programs," both of which cast additional doubt on Burton's already implausible assumption that Select Auto would instantaneously generate significant profits in forty-nine additional zones.

Target argues alternatively that, assuming its lost profits are too indefinite to calculate accurately, it ought to be entitled to recover its lost investment of $150,000 as a proxy. This amount would obviously be more than sufficient to support federal diversity jurisdiction and defeat ADVO's motion for summary judgment. The district court rejected this argument, holding that Illinois law does not permit an award of damages to put the complaining party in a better position than it would have been in absent the other party's breach. This view of Illinois law is correct, see *Midwest Software, Ltd. v. Willie Washer Mfg. Co.*, 258 Ill.App.3d 1029, 196 Ill.Dec. 923, 938, 630 N.E.2d 1088, 1103 (1994), as is the conclusion that awarding Target its lost investment would have the prohibited effect. In the absence of ADVO's alleged breach, Target would have lost its investment and received only whatever profits Select Auto could have generated during the contract term. Having failed to prove that those profits would have amounted to even $50,000, Target cannot receive the windfall of recouping its $150,000 investment.

The district court did not abuse its discretion in finding that Target could not adequately prove that its damages from the alleged breach would exceed the jurisdictional minimum amount. The grant of summary judgment for ADVO on the breach of contract claim must therefore be affirmed. In light of this conclusion, this Court need not address ADVO's alternative argument for upholding the grant of summary judgment, based on Illinois law concerning proof of lost profits for new enterprises.

## II. BREACH OF FIDUCIARY DUTY CLAIM

Target bases its claim for breach of fiduciary duty on the existence of a so-called "ADVO plan" that allegedly called for sabotaging the joint venture, breaching the contract with Target, and then continuing with the Select Auto idea alone. Because the outline and features of Select Auto belonged to Target, this plot would have amounted to a calculated effort to appropriate Target's ideas. As evidence of the plan, Target first identifies a conversation that former ADVO Vice President Hank Rodkin says he had with two other ADVO executives in January

1994 concerning the desirability of proceeding with the Select Auto project without Target's participation. Next, Target offers internal ADVO documents showing that in the month or so following ADVO's alleged breach of the joint venture contract, ADVO employees pursued the idea of developing an "Auto Industry Advertising Vehicle." According to Target, many of the terms used to describe this potential "vehicle" were characteristic of and unique to Select Auto.

 . Under Illinois law, a fiduciary relationship does exist between partners in a joint venture. See, e.g., *Holstein v. Grossman*, 246 Ill.App.3d 719, 186 Ill.Dec. 592, 604–605, 616 N.E.2d 1224, 1236–1237 (1993). Target has failed, however, to produce evidence that could prove a breach of that duty by ADVO.

Even when combined with Target's allegation that ADVO successfully sabotaged Select Auto in Cleveland by withdrawing its sales support at a crucial moment, the Rodkin meeting and ADVO's consideration of an auto industry project do not amount to a breach of fiduciary duty. Most importantly, ADVO never actually developed or marketed an advertising publication aimed at the automobile industry. Moreover, Rodkin's own testimony concerning the January 1994 meeting indicates that what Target calls a "discussion" of ADVO's proceeding with Select Auto alone was really no more than a "casual remark" by one executive. Finally, the descriptive terms used to describe ADVO's proposed auto industry project—terms that Target claims are distinguishing characteristics of Select Auto—appear in the ADVO memos as options, frequently opposed to other options that are their precise opposites. To give one example, Target claims that ADVO's memos used the term "exclusive," meaning that only one dealer in a given make of car would advertise in each issue of the publication. The same memo, however, suggests as an alternative that the publication be "non-exclusive." The claim that ADVO was trying to continue with the Select Auto concept after eliminating Target and appropriating its ideas simply lacks evidentiary support.

The district court did not err in granting summary judgment for ADVO on this claim.

Affirmed.